# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DIONE A. FAVORS,          )
           )
      Plaintiff,       )
           )
v.                    )    **CIVIL ACTION 09-0045-WS-N**
           )
ALABAMA POWER COMPANY,   )
           )
      Defendant.     )

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 28). The Motion has been briefed and is ripe for disposition at this time.[1]

---

[1] Also pending are defendant's Motion to Remove from the Public Record and File under Seal Plaintiff's Memorandum (doc. 44), defendant's Motion for Leave to File under Seal its Motion to Strike Portions of Dione Favors' Declaration (also at doc. 44), and defendant's Motion to Strike Portions of Dione Favors' Declaration (doc. 44, at Exh. A). Defendant's requests to place plaintiff's summary judgment submissions (docs. 37 & 38) and its Motion to Strike under seal are animated solely by the fact that those materials disclose an Alabama Power settlement offer in a particular amount in this litigation. Certainly, defendant is correct that evidence of specific settlement offers or demands is generally inadmissible under Rule 408, Fed.R.Evid. However, that a fact is inadmissible does not, without more, necessitate removal from the public record of all documents containing that fact. Defendant has made no showing to justify this extraordinary measure. After all, "[t]he common-law right of access to judicial proceedings … is instrumental in securing the integrity of the process" and unquestionably "includes the right to inspect and copy public records and documents." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001). "Material filed in connection with any substantive pretrial motion … is subject to the common law right of access." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007); *see also Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d, 157, 161-62 (3rd Cir. 1993) (recognizing "pervasive common law right to inspect and copy … judicial records and documents," as well as "presumption that the public has a right to inspect and copy judicial records") (internal quotation marks and citations omitted). "The common law right of access may be overcome by a showing of good cause." *Romero*, 480 F.3d at 1246; *see also Dees v. Hydradry, Inc.*, --- F. Supp.2d ----, 2010 WL 1539813, *12 (M.D. Fla. Apr. 19, 2010) (before sealing document, district court must identify overriding interest that seal "is essential to preserve higher values and is narrowly tailored to serve that interest") (citation omitted). Defendant's reliance on Rule 408 to show inadmissibility does not constitute good cause to overcome the presumption of public access; therefore, defendant's Motion to Remove from the Public Record and Place Under Seal is (Continued)

# I.    Factual Background.[2]

Plaintiff, Dione A. Favors, proceeding *pro se*, brought this employment discrimination action against defendant, Alabama Power Company, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*  Favors maintains that Alabama Power discriminated against her on the basis of her religion (Jehovah's Witness) and retaliated against her for engaging in protected activity by disciplining and firing her.

## A.    *Favors' Employment at Alabama Power.*

Favors commenced employment at Alabama Power in November 2007, when she accepted a full-time Customer Service Representative ("CSR") position at defendant's Prichard Business Office.  (Favors Decl., ¶ 2.)  Favors was one of four CSRs employed by Alabama Power at that location.  (Favors Dep., at 73-74; Thomas Decl., ¶ 6.)  In this capacity, Favors reported directly to Loretta Thomas, Manager of the Prichard office, who in turn reported to Sam Covert, Division Area Manager.  (Thomas Decl., ¶ 1.)

In early February 2008, Thomas received a report that Favors was distributing religious literature and pamphlets to Alabama Power customers in the parking lot during work hours. (Thomas Decl., ¶ 10.)  When Thomas questioned her about this allegation, Favors admitted its accuracy.[3]  Thomas instructed her to refrain from such conduct, and Favors complied.  (Favors Decl., ¶¶ 4-5; Thomas Decl., ¶ 10.)  Although Thomas denies it, Favors' evidence is that Thomas

---

**denied**, and its Motion for Leave to File Under Seal its Motion to Strike Portions of Declaration is likewise **denied**.  Documents 37 and 38 will not be sealed, and the Clerk of Court is **directed** to unseal document 44 and its exhibit.

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[3]    In Favors' own words, when asked whether she was distributing religious pamphlets to customers, "I told her I was.  I didn't act as if I didn't do it.  I told her what I was doing." (Favors Dep., at 115.)  On summary judgment, Favors seeks to justify her conduct by stating that, as a Jehovah's Witness, she feels an "obligation … to preach and/or teach persons who welcome our positive message of hope and peace" and that she "use[s] any opportunity that presents itself to do so."  (Favors Decl., ¶ 3.)

also instructed her at this time to refrain from reading religious material in her car during lunch hour on workdays.  (Johnson Decl., ¶ 18 & Exh. 7.)[4]

There were no further issues, concerns or incidents with Favors handing out faith-based materials at or near the workplace.  Thomas never discussed the issue with Favors again.  (Doc. 46, at C.1.b(v).)  That said, Favors chafed at the restriction against engaging in her religious ministry during work hours.  She requested a part-time schedule in March 2008 so that she could have more time to devote to religious ministry matters (although she does not allege that she told Alabama Power this was the reason for her request).  (Favors Decl., ¶ 6.)  She also claims that Thomas scheduled a team meeting for 5:40 p.m. one night, interfering with Favors' evening ministry, and that one day in March 2008 Thomas asked if Favors had spent her vacation day engaging in her religious ministry.  (*Id.*)  However, Favors admits that Thomas, Covert, other Alabama Power managers, and her co-workers never made any negative or disparaging comments to her about her religion.  (Favors Dep., at 320; doc. 46, at C.1.b(vi).)

As of late March 2008, Alabama Power regarded Favors as a strong performer in the Prichard office.  A performance evaluation signed by Thomas on March 31, 2008 rated Favors as "Expectations Fully Met" and stated that Favors "is a very hard worker, and demonstrates courtesy, compassion and dependability."  (Favors Dep., Exh. 9.)  The evaluation applauded Favors' "expertise in handling customers" and her "leadership example in everything that she does."  (*Id.*)  By all appearances, as of March 31, 2008, Alabama Power regarded Favors as a valued employee who was performing fine work in the Prichard office.  The next day, however, a chain of problems, difficulties, and disputes commenced, ultimately culminating in Favors' discharge a month later.

### B.    Sick Leave and Part Time Issues.

On the morning of April 1, 2008, Favors left a message for Thomas calling in sick.  (Favors Decl., ¶ 10.)  Thomas called Favors back, explaining that another employee had also

---

[4]     With respect to the reading of the Bible during lunch hour, it bears noting that Favors did not object to this alleged directive from Thomas at the time.  Indeed, Favors did not report or complain about it to company officials until April 17, 2008, weeks after her initial complaint and some two and a half months after the directive was given.  Even then, this concern was buried amidst pages of narrative by Favors documenting an array of dissatisfactions with Thomas.  By all appearances, then, Favors did not subjectively regard Thomas's purported restriction on her reading the Bible as being severe or pervasive.

called in sick and asking whether Favors might be able to come to work later that day.  (*Id.*)
Favors responded that she "would return if doctor gave me permission to do so."  (*Id.*)  Favors
never called Thomas back that day to advise of her status or intentions, and never came into
work that day, either.  (Thomas Decl., ¶ 15.)[5]  Favors left another message for Thomas early on
the morning of April 2 calling in sick.  (Favors Decl., ¶ 11.)  Thomas called her back later that
morning, expressed dismay that she had not heard from Favors again on April 1, and asked when
she was returning to work.  (Favors Dep., at 160.)

Favors' reaction to Thomas's April 2 inquiry was to lodge an internal complaint against
her.  On the morning of April 2, while still out sick, Favors called Hugh Bryant, Manager of
Alabama Power's Ethics and Corporate Concerns Department, and complained about "being out
sick and being told to come to work while sick."  (Favors Dep., at 161-62.)  Favors also
complained to Bryant that Thomas had improperly asked about her diagnosis and medications,
and that a co-worker (Antoinette Madison) had tried to reach Favors on her cell phone on April
1.  (Bryant Decl., ¶ 5.)[6]  Bryant opened a "Concern file" and assigned Steven Johnson to
investigate.  (*Id.*, ¶ 6.)

Favors continued to call in sick on April 3, 4, and 7, but returned to work on April 8.
(Favors Decl., ¶¶ 12-15.)  At that time, Thomas informed Favors that her request to work part-
time was still awaiting approval, and said that she knew Favors was looking forward to having
more time to pursue her religious ministry.  (*Id.*, ¶ 15.)  This information conflicted with
Thomas's statement to Favors on March 26 that Covert had approved her request to work part-

---

[5]     In her summary judgment materials, Favors explains that the earliest available
doctor's appointment was at 4:15 p.m., which made it too late for her return to work that day.
(Favors Decl., ¶ 10.)  But the point is not that Favors did not come to work, it is that she never
called her supervisor back to explain these circumstances even though she knew Thomas was
waiting to hear from her.

[6]     Favors speculated to Bryant that Madison's call meant that Thomas must have
divulged Favors' confidential medical information to her.  Of course, since Favors did not take
the call, she had no actual knowledge of why Madison was trying to reach her, and had no basis
in fact for accusing Thomas of improperly disclosing private medical information.  (Bryant
Decl., at Exh. 1.)

time.  (*Id.* ¶¶ 7, 15.)[7]  In any event, Thomas met with her boss, Sam Covert, that day to recommend that Favors' part-time request be granted.  (Covert Decl., ¶ 6.)  However, Covert, in consultation with human resources officials, denied the request because of the cost increases associated with converting one full-time position into two part-time jobs (thanks to duplication of medical benefits, increased hiring and training costs, etc.).  (*Id.*)  Thomas notified Favors of that decision on April 10 and offered her cross-training in other work areas that might be more conducive to part-time work, in response to which Favors said she would consider those options and "thanked her for presenting my part-time request to Sam Covert."  (Favors Decl., ¶ 16; Thomas Decl., ¶¶ 20-21.)  Favors admits that Thomas apologized to her for the denial of her part-time request and that Thomas had been supportive of the request.  (Favors Decl., ¶¶ 15, 18.)

### C. Termination of Favors' Employment.

On April 14, 2008, Covert asked Thomas to nominate one of her employees to attend a Leadership Focus meeting in Mobile at 1:15 p.m. on April 16.  (Thomas Decl., ¶ 22.)  Thomas nominated Favors for this honor because Thomas "believed she was the strongest leadership candidate in the Prichard office," and because Favors had expressed specific interest in moving into a management position.  (*Id.*; Covert Decl., ¶ 9.)  By nominating Favors, Thomas sought to help her achieve her stated career goals.[8]  The next day, however, Favors told Thomas that she was not interested in attending the Leadership Focus meeting.  (Favors Decl., ¶ 19.)  Thomas balked at Favors' decision, and eventually Covert and Favors spoke about the matter directly by telephone.  (Thomas Decl., ¶¶ 23-24; Favors Decl., ¶ 19.)  Covert's recollection of that conversation is that he repeatedly, specifically directed her "that she was assigned to go to the meeting as the Prichard office representative."  (Covert Decl., ¶ 11.)[9]  In her Declaration, Favors

---

[7]      Thomas denies ever having told Favors that her part-time request had been approved.  (Thomas Decl., ¶¶ 11, 12, 17.)  For purposes of defendant's Motion for Summary Judgment, however, the Court construes the facts in the light most favorable to Favors, and resolves all credibility disputes in her favor.

[8]      Favors recognized as much, as she thanked Thomas and told her that "you are the only person who has ever tried to help me."  (Thomas Decl., ¶ 24.)

[9]      This account is bolstered by Thomas's testimony that after the call ended, Favors told Thomas that Covert had said, "It's an assignment," in response to which Thomas reiterated, "you have to do it.  It's your assignment."  (Thomas Decl., ¶ 24.)  It is further supported by (Continued)

does not specifically refute Covert's testimony; rather, she merely indicates that Covert "expressed it being a good opportunity and anyone from the Prichard Business Office could attend." (Favors Decl., ¶ 19.)[10]

Favors did not attend the Leadership Focus meeting. (Favors Dep., at 200; Covert Decl., ¶ 12.) Covert deemed this failure to be a serious matter, and determined that he "could not allow an employee to simply disregard a direct instruction without consequences." (Covert Decl., ¶ 12.) In Covert's view, Favors' conduct amounted to insubordination for which formal disciplinary action was warranted. (*Id.*, ¶¶ 12-14.) Covert reached his decision to discipline Favors for this incident no later than April 17, 2008. (*Id.*, ¶ 32.)

Covert and Carol Weaver (a human resources consultant at Alabama Power) convened a meeting with Favors on April 28, 2010 to discuss disciplinary action. (Covert Decl., ¶ 15; Favors Decl., ¶ 21.) At that meeting, Covert asked Favors to explain why she had failed to attend the Leadership Focus event. (Covert Decl., ¶ 15.) Favors' reaction was one of "total shock" as she explained that she had interpreted Covert's statement that "anyone from the Prichard Business Office could attend" as meaning that "it was optional" that she attend. (Favors

---

Favors' own typewritten notes appended to her Complaint, wherein she wrote that after she told Covert she was not interested in attending the meeting, "Sam ignored me stating I should be present tomorrow. … (Loretta repeated called me into her office trying force me to attend the meeting)." (Complaint, Ex. B, at 3.) Also, two witnesses to the conversation on Covert's end of the line specifically heard him instruct her to attend the meeting and tell her that she was assigned to be there. (Patterson Decl., ¶ 6; Robertson Decl., ¶ 5.) And Favors told Steven Johnson, the Alabama Power investigator, that Covert had instructed her to attend the meeting. (Johnson Decl., ¶ 9.)

[10]     To the extent that Favors frames the facts differently in her summary judgment brief, that version will not be credited for purposes of identifying the facts in the light most favorable to her. Rather, only those factual allegations presented in affidavit or declaration form will be credited. Favors does not get to tell two different stories in her brief and declaration, then switch back and forth between them at her convenience. *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or in part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.").

Decl., ¶ 21.)[11]  According to Favors, Covert responded that this understanding was "incorrect" and that he had issued a "command to attend the focus group on April 16." (*Id.*)  Favors' demeanor was defensive and argumentative. (Covert Decl., ¶ 20.)  Ultimately, Covert told Favors that she was receiving level three discipline for this incident, meaning that she was not to report to work the following day, April 29, 2008, but she was to return on April 30 with a plan indicating how she would improve her performance. (Favors Dep., at 238-39.)  Covert also told Favors during the April 28 meeting that "he knew [she] had called in an internal complaint," but that this discipline was not retaliatory and had nothing to do with her report to the Concerns Group. (Favors Decl., ¶ 21.)

On April 30, 2008, Favors again met with Covert and informed him that she "could not formulate an improvement for performance" because she had not been insubordinate in the first place. (Favors Decl., ¶ 22.)  Thus, Favors continued to insist that she had done nothing wrong and that the Leadership Focus meeting was not mandatory.  Favors then requested a flurry of documentation, including copies of her 2007 performance plan, internal productivity records, and materials delineating which meetings required mandatory attendance. (Covert Decl., ¶ 24.)  After handing Favors a copy of defendant's Non-Punitive Discipline Policy and giving her a full opportunity to review it in private, Covert asked Favors whether she was willing to meet all expectations in the areas of safety, conduct, performance and attendance.[12]  Favors refused to answer. (*Id.*, ¶¶ 23,25.)  Covert then asked her whether she would follow directions, orders and assignments that were not illegal, immoral or unethical.  Favors dodged the question. (*Id.*, ¶ 26.)

---

[11]    Once again, plaintiff's version of the facts diverges markedly from defendant's on this point.  While Favor's evidence is that she told Covert at the April 28 meeting that she understood her participation at the Leadership Focus meeting to be optional, Alabama Power's evidence is that Favors admitted on April 28 that Covert had told her it was an "assignment" for her to attend. (Covert Decl., ¶ 18.)  For summary judgment purposes, plaintiff's version of the facts is credited.

[12]    In asking this question, Covert was adhering to the express requirements of Alabama Power's Non-Punitive Discipline Policy, which provides that when an employee returns to work after a third-level notice suspension, "The employee is asked to announce his/her decision to remain employed and meet all performance expectations or to resign." (Weaver Decl., ¶ 14 & Exh. 1, at 396.)  Covert's question was thus required by the terms of defendant's discipline policy, which plaintiff must have known because she had received and reviewed a copy of that policy minutes before the question was posed to her.

Based on these exchanges, Covert placed Favors on contingency leave and instructed her not to return to work until asked to do so. (*Id.*, ¶ 27.)

On May 1, 2008, Covert and Weaver met with Favors to give her one last opportunity to commit to meeting performance expectations. (*Id.*, ¶ 29.) At that time, Covert provided her with some of the documents she had requested, including her 2007 performance plan, but told her that the productivity materials she sought were a management tool that would not be provided and that documents concerning mandatory meetings did not exist. (*Id.*) He then asked Favors whether she was willing to commit to meeting expectations in the areas of conduct, performance, safety and attendance. Once again, Favors refused to answer, and said she would not do so unless the requested documents were provided. (*Id.*, ¶ 30.) Covert notified Favors at that time that her employment was being terminated, effective that day, for her repeated refusal to commit to meeting performance expectations and taking accountability and responsibility. (*Id.*, ¶ 31.)

### D. Favors' Internal Complaints.

None of the above-described disciplinary and termination events happened in a vacuum. Indeed, the internal complaint that Favors had called in on April 2 during her sick leave had expanded and proliferated throughout the month. Even as the issues concerning the Leadership Focus meeting swirled, Favors was moving forward with internal complaints directed primarily at Thomas. At lunchtime on June 16, shortly before the Leadership Focus meeting was to take place, Favors met with Steven Johnson, the Alabama Power investigator assigned to her complaint about sick leave. (Favors Decl., ¶ 20.) At that time, she voiced concerns to Johnson about the denial of her request for part-time work and the handling of her sick leave (including the phone calls from Thomas and Madison). (Johnson Decl., ¶ 8.) Favors told Johnson that she felt Thomas's efforts to induce her to attend the Leadership Focus meeting amounted to harassment. (*Id.*, ¶ 9.) In the wake of his meeting with Favors, Johnson scheduled witness interviews, at which time he notified Thomas and Covert of Favors' internal complaints. (*Id.*, ¶ 10.) Indeed, the first time Thomas ever learned of Favors' complaints against her was on the afternoon of June 16, after Favors had unequivocally stated that she would not attend the Leadership Focus meeting and after Thomas had notified Covert of that fact. (Thomas Decl., ¶ 26.)

On the afternoon of April 17, 2008, just one day after meeting with Johnson to discuss her complaints, Favors sent a lengthy e-mail to Johnson, purporting to be a blow-by-blow

narrative of work-related dissatisfactions, catalogued on a daily basis from February 4, 2008, through April 17, 2008. (Johnson Decl., ¶ 18 & Exh. 7.) Among the dozens of incidents of perceived slights reported in this e-mail was a single allegation that on one occasion in early February, Thomas had told Favors that she could not read religious material in her car during lunch hour while she was on company premises. (*Id.*)

On April 26, 2008, Favors provided additional details to Johnson concerning allegations of unfair treatment and religious discrimination.[13] In particular, Favors revealed that after she had been interviewed and offered employment in October 2007 (some six months earlier), one of her Alabama Power interviewers, Ron Martin (who was the Customer Service Manager of the Hillcrest office), "asked her faith" and provided a "seemingly positive response" when she answered. (Favors Dep., Exh. 21, at 19.)[14]

On April 30, 2008, Favors again contacted Johnson, this time to complain that she "was still being retaliated on with an attempt to falsely discipline me and eventually terminate me." (Favors Decl., ¶ 22.) Favors indicated to Johnson that she would likely be fired that day for not responding to Covert's question about improving in the areas of conduct, performance, safety

---

[13]    The timing of these specific allegations is murky. Johnson says Favors presented this information to him via e-mail on April 26, 2008 (Johnson Decl., ¶ 19); however, a legend at the bottom of the e-mail reads as follows: "This summary prepared by Steve Johnson (4-17-2008) and provided to the submitter for review (4-18-2008)." (Favors Dep., Exh. 21, at 21.) It appears that the exhibit may constitute Favors' April 26 markups to a summary prepared by Johnson on April 17, but it is difficult to discern precisely what information was provided when. Favors' revisions/additions are not set off from the text of Johnson's original e-mail. Nonetheless, Favors does not challenge or rebut Johnson's contention that she provided this information to him in an April 26 e-mail; therefore, the Court will accept that fact for purposes of summary judgment.

[14]    Viewed in the light most favorable to plaintiff, the facts surrounding this incident were as follows: Favors interviewed with Thomas and Martin for the CSR vacancy at Alabama Power. They offered her the job on the spot. (Favors Dep., at 65.) Thereafter, Thomas and Martin invited her to breakfast. (*Id.* at 66.) At breakfast, Martin inquired, "if you don't mind me asking, you know, what religion are you." (*Id.*) Favors was not offended and "didn't think it was a problem" for Martin to ask such a question, given that she already had received the job offer, so she told Martin that she was a Jehovah's Witness and asked him what his religion was. (*Id.* at 66-67.) Favors never spoke with Martin again about her (or his) religion and never had substantive work interaction with him, given that she did not work at the Hillcrest office where Martin was a supervisor. (*Id.* at 68; Martin Decl., ¶¶ 10-11.)

and attendance. (Johnson Decl., at Exh. 9.) After her termination, Favors complained further to Johnson about retaliation and the like. (*Id.*, ¶ 21.) Upon investigation, Johnson concluded that none of her complaints were substantiated. (*Id.*, ¶ 23.)

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted). Nor does Favors' *pro se* status materially alter the summary judgment analysis, or alleviate her burden of establishing genuine issues of material fact. *See Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) (although "*pro se* complaints are entitled to a liberal interpretation by the courts, we hold that a *pro se* litigant does not escape the essential burden under summary judgment standards of

-10-

establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment").

## III.  Analysis.

### A.  *McDonnell Douglas Framework.*

The parties' respective summary judgment arguments on Favors' discrimination and retaliation claims are properly evaluated under the time-honored *McDonnell Douglas* standard. Absent direct evidence of discrimination or retaliation (which has not been presented here), Favors must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and/or retaliation.[2]  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11th Cir. 2005).

At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination."  *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997) (outlining similar procedure for Title VII retaliation claims).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).  Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient."  *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11th Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue

---

[2]     Favors' burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) ("the *prima facie* requirement is not an onerous one").

of material fact that the employer's proffered reason … was pretextual."). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007). Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (*en banc*).

**B.    Religious Discrimination Claims.**

The *pro se* Complaint provides little definition of Favors' Title VII religious discrimination claim, but merely mentions in vague terms "[a] complaint of religious discrimination" and "a complaint about religious discrimination practices." (Doc. 1, ¶¶ 4, 5.)[15] From later filings as well as the parties' summary judgment briefing, however, it is evident that Favors maintains she was subjected to religious harassment and disparate treatment on the basis of her Jehovah's Witness faith. For example, in the Report of Parties' Planning Meeting, Favors wrote, "I received unfair treatment because of my choice of religious affiliation along with consistent harassment solely from various individuals." (Doc. 14, at 1-2.) Alabama Power does not contest, and indeed appears to agree, that the religious discrimination component of Favors' Title VII cause of action includes both religious harassment and disparate treatment components. Each of these theories will be addressed separately.

**1.    Religious Harassment.**

Federal appeals courts that have addressed the issue have employed the same analytical framework for Title VII claims of religious harassment as for claims of sexual or racial harassment. Thus, to survive summary judgment on a claim of religious harassment, a Title VII

---

[15] Such conclusory pleading appears to fall well short of the *Twombly / Iqbal* pleading standard. *See, e.g., Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (to survive a motion to dismiss, "[a] complaint must state a plausible claim for relief," meaning that the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (citations omitted). At a minimum, Alabama Power could have filed a motion for more definite statement under Rule 12(e), Fed.R.Civ.P., to force Favors to add clarity and specificity to her claims. No such elaboration having been demanded or provided, the Court and litigants have little choice now but to play the Complaint as it lies.

plaintiff must show "(1) intentional harassment because of religion, that (2) was severe or pervasive, and (3) detrimentally affected [her], and (4) would detrimentally affect a reasonable person of the same religion in that position, and (5) the existence of respondeat superior liability." *Prowel v. Wise Business Forms, Inc.*, 579 F.3d 285, 292 (3rd Cir. 2009).[16]

Favors admits that none of her managers, supervisors or co-workers ever made negative or insulting comments to her about her religious beliefs. Nonetheless, she attempts to construct a religious harassment claim from offhand references by Thomas and others to her religion from time to time. Viewing the summary judgment record in the light most favorable to Favors, the sum total of religious harassment to which she was subjected consisted of the following: (a) Martin made an isolated inquiry after she had been offered the job as to her religion, but she never worked with Martin or discussed religion with him again; (b) Thomas told Favors on one occasion not to distribute Jehovah's Witness literature on company property or during working hours, and not to read her Bible on her lunch hour;[17] (c) one evening, Thomas rescheduled a team meeting for 5:40 p.m., which interfered with Favors' evening ministry; (d) after a day off, Favors was asked by Thomas whether she had spent her day engaging in her religious ministry;

---

[16]     The Eleventh Circuit applied the same standard to a religious discrimination case in *MackMuhammad v. Cagles Inc.*, 2010 WL 1896355, *3 (11th Cir. May 12, 2010). *See also E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313 (4th Cir. 2008) (hostile work environment claim based on religion requires showing that "harassment was (1) unwelcome, (2) because of religion, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer"); *Cohen-Breen v. Gray Television Group, Inc.*, 661 F. Supp.2d 1158 (D. Nev. 2009) (to state an actionable hostile work environment claim, plaintiff must show that "(1) she was subjected to verbal or physical conduct based on her religion; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment"); *Wheeles v. Nelson's Elec. Motor Services*, 559 F. Supp.2d 1260, 1271 (M.D. Ala. 2008) (noting that standards for claim of hostile work environment based on religion are identical to those for sexual harassment claim).

[17]     On the surface, the instruction not to read the Bible may seem problematic. But there is no evidence that Thomas ever enforced or discussed this directive with Favors again, that Favors complained about it to anyone within a reasonable time, or that it visited any material hardship on Favors. There is not even evidence that Favors wanted to read her Bible during lunch hour, or that she would have done so were it not for Thomas's edict. As such, neither the subjective nor the objective detriment requirements appear satisfied here.

and (e) on another occasion, Thomas indicated to Favors that she knew Favors was looking forward to having more time to pursue her religious ministry.

Such incidents, viewed cumulatively and under the totality of the circumstances, are far too innocuous and benign to satisfy the "severe or pervasive" prerequisite for a hostile work environment claim. "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (citations omitted). Rather, "Title VII is only implicated in the case of a workplace that is permeated with discriminatory intimidation, ridicule and insult, not where there is the mere utterance of an … epithet." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276-77 (11th Cir. 2002) (citation and internal quotation marks omitted). This criterion is plainly not satisfied here. Favors has pointed to nothing more than isolated incidents that were infrequent and mild, that were in no way threatening or humiliating, and are in large part mere acknowledgments by her supervisor of awareness of the importance of Favors' faith to her daily life. *See generally McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (for purposes of "severe or pervasive" inquiry, courts consider totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance") (citations omitted). That is simply not enough, and courts have consistently dismissed religious hostile work environment claims for similar infirmities of proof.[18]

---

[18] *See, e.g., MackMuhammad*, 2010 WL 1896355, at *3 (Muslim employee was not subjected to religious harassment where manager referred to him as "Bin Laden" or "Muhammad-man" over company radio and intercom, and where supervisors asked him about his religion and made comments about his religious dietary restrictions, because such comments were at most insensitive and rude, and did not rise to level of severe and pervasive harassment); *Richardson v. Dougherty County, Ga.*, 2006 WL 1526064, *5 (11th Cir. June 5, 2006) (rejecting Title VII hostile work environment claim where supervisor referred to plaintiff more than 50 times as "preacher man" and made comments about his religion and request for accommodation, where such conduct was not objectively severe or pervasive); *Jones v. United Space Alliance, L.L.C.*, 2006 WL 250761, *4 (11th Cir. Feb. 3, 2006) (dismissing hostile environment claim because complained-of conduct was not objectively severe or pervasive, where manager made derogatory remarks based on plaintiff's religion, co-worker removed flyer advertising plaintiff's church events, manager told him to remove lanyard with name "Jesus" on it, manager told him not to leave his Bible on his desk, and he was asked to turn down religious music played at work); *Wheeles*, 559 F. Supp.2d at 1272 (dismissing religious harassment claim where plaintiff failed to satisfy "severe or pervasive" requirement and complained-of conduct was nothing more (Continued)

As such, the Court finds as a matter of law that the incidents of harassment to which Favors objects are not actionable under Title VII because they were not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Defendant's Motion for Summary Judgment is **granted** with respect to the religious harassment claim.[19]

        *2.     Disparate Treatment.*

---

than "slightly insulting"); *Hodson v. Alpine Manor, Inc.*, 512 F. Supp.2d 373, 387-88 (W.D. Pa. 2007) (granting summary judgment for employer on religious harassment claim where plaintiff, who was evangelical Christian, alleged that co-workers made isolated comments about "laying hands on" patients to "heal" them, thus mocking her beliefs, but such comments were, at most, offensive utterances insufficient to create a hostile work environment).

[19]     In reaching this conclusion, three other points should be noted. First, the Court understands that Favors labeled certain other conduct by defendant as "harassment," including for example Thomas's efforts to persuade Favors to attend the Leadership Focus meeting, the denial of Favors' request for part-time work, the handling of Favors' sick days in late March, and the like. Even if plaintiff subjectively perceived these events to be harassing, she has not made any showing that such harassment is "based on a protected characteristic of the employee," *McCann*, 526 F.3d at 1378 (citation omitted), as is required to establish a hostile work environment claim under Title VII. There are simply no record facts to link these incidents to her religion. Second, while certain facts relate to Favors' desire to perform her religious ministry on and off company property during on- and off-duty hours, plaintiff does not contend that she is bringing a claim for failure to provide religious accommodation; therefore, the Court has not examined and will not examine the sufficiency of the record facts to support a cognizable claim on that theory. Third, to the extent that Favors' claim is that Thomas sought to push her out of Alabama Power once she learned that Favors was a Jehovah's Witness, that contention is irreconcilable with the abundant, undisputed evidence that Thomas evaluated Favors' performance favorably, helped her identify and pursue cross-training opportunities, told Alabama Power management that Favors was a tremendous asset to the Prichard office, advocated in support of Favors' part-time request, and sought to assist her in achieving her stated goal of obtaining a leadership role within the company. For example, Favors admits that Thomas gave her an "excellent performance review" and invited her to lunch with the mayor of Prichard in late March 2008, as a reward. (Favors Decl., ¶ 9.) Favors further admits that Thomas told Covert "what an asset [Favors] was to the Prichard Business Office" and that Thomas worked to find ways that Favors might be able to work part-time. (*Id.*, ¶ 16.) Company officials report that Thomas "spoke highly of" Favors to them. (Weaver Decl., ¶ 5.) These and other record facts cannot be squared with Favors' apparent theory that Thomas was "out to get her" as soon as she learned back in October 2007 (before Favors had even begun working at Alabama Power) that Favors is a Jehovah's Witness.

In general, to establish a *prima facie* case of disparate treatment under Title VII, a plaintiff must show that "(1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." *Crawford*, 529 F.3d at 970. This standard applies equally in the religious discrimination context. *See Dixon v. Palm Beach County Parks and Recreation Dep't*, 2009 WL 2707539, *1 (11th Cir. Aug. 31, 2009) (*prima facie* case of religious discrimination requires showing of membership in protected class, adverse employment action, more favorable treatment of similarly situated employees outside of protected class, and qualification for job or benefit).

Plaintiff's Complaint does not specify precisely which employment actions by Alabama Power are within the ambit of her disparate treatment claim; however, a fair reading of her filings is that she is bringing Title VII disparate treatment claims based on the denial of her request for a part-time job assignment, the imposition of third-level discipline, and the termination of her employment. (Doc. 37, at 6-7.)[20]

Favors has failed to establish a *prima facie* case of religious discrimination with regard to the part-time job denial, the discipline, or the discharge for at least two independent reasons. First, the law of this Circuit explains that an additional *prima facie* element is that the plaintiff must "demonstrate[] the challenged employment decision was made by someone who was aware of the plaintiff's religion. … [A]n employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion." *Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1305-06 (11th Cir. 2002). Simply put, "[i]t is

---

[20]    To the extent that Favors seeks to pursue a disparate treatment claim based on the scheduling of a meeting for 5:40 p.m. rather than 5:05 p.m., and the granting of her vacation day for March 28 rather than March 27 (*see* doc. 37, at 6-7), such trifling, workaday, run-of-the-mill slights plainly do not rise to the level of "adverse employment actions" necessary to state a *prima facie* case of discrimination under Title VII. *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) (reaffirming that "only those employment actions that result in a serious and material change in the terms, conditions, or privileges of employment will suffice" to satisfy the "adverse employment action" requirement for a Title VII discrimination claim) (citations and internal quotation marks omitted). Favors' unhappiness that she was forced to attend a meeting 35 minutes later than she wished, and that she was given a vacation day one day later than the day she wanted, do not come anywhere close to the necessary level of materiality to be actionable under Title VII disparate treatment principles.

necessary for a plaintiff attempting to establish a *prima facie* case of intentional religious discrimination under Title VII to demonstrate the challenged employment decision was made by someone who had knowledge of the plaintiff's religion." *Id.* at 1307 (granting summary judgment for defendant where plaintiff failed to establish that person responsible for adverse employment action knew about his religion). Here, the record evidence is clear and undisputed that Covert was the decision maker for the contested decisions not to create a new part-time position for Favors, to discipline her for not attending the Leadership Focus meeting, and to terminate her employment for refusing to commit to performance expectations. But there is no evidence that Covert was aware of Favors' religious faith. Common sense dictates that Covert could not have been discriminating against Favors for being a Jehovah's Witness if he did not know she was a Jehovah's Witness, and there is no indication and no evidence in the record that he possessed such knowledge. Accordingly, just as in *Lubetsky*, the dearth of record evidence that the decision maker knew of Favors' religious beliefs prevents her from establishing a *prima facie* case and warrants entry of summary judgment in Alabama Power's favor on plaintiff's disparate treatment cause of action.

Favors has also failed to meet her burden of establishing a *prima facie* case of religious discrimination by neither arguing, nor showing, that employees outside of her protected class were treated more favorably than she. There is no evidence, for example, that similarly situated non-Jehovah's Witnesses at Alabama Power were granted part-time status upon request, that they were not disciplined for failing to attend meetings,[21] or that they were not discharged for repeatedly refusing to commit to meeting performance expectations. This omission is fatal to Favors' Title VII religious discrimination claims predicated on a disparate treatment theory. *See, e.g., MackMuhammad v. Cagle's, Inc.*, 2010 WL 1896355, *2 (11th Cir. May 12, 2010) (plaintiff

---

[21] The Court recognizes that Favors included an allegation in her EEOC Charge that "Cynthia Tatum did not attend a meeting in March 2008, but her employment was not terminated." (Favors Dep., at Exh. 26.) But by Favors' own admission, Tatum was not a similarly situated employee. Favors testified that Tatum skipped a meeting because "we were working short … or we were really busy," such that Tatum "couldn't attend her meeting." (Favors Dep., at 305.) In contrast to Tatum, who could not attend a meeting because pressing work responsibilities prevented her from doing so, Favors did not attend a meeting for the sole reason that she did not want to go. These circumstances are in no way analogous, and Tatum is not similarly situated to Favors.

failed to establish a *prima facie* case of religious discrimination where he did not argue, much less show, "that he had been treated more harshly than similarly-situated employees, and did not identify any comparable employee").[22]

Even if Favors had made a *prima facie* showing of religious discrimination, Alabama Power has come forward with legitimate non-discriminatory reasons for each of the challenged personnel actions. Alabama Power's evidence shows the following: (a) Favors was denied a part-time assignment because of the increased costs (benefits, hiring, training) associated with converting her existing full-time job into two part-time jobs (Weaver Decl., ¶ 6); (b) Favors was disciplined for missing the Leadership Focus meeting because Covert's recollection was that he had specifically directed her to attend it, such that her failure to do so amounted to insubordination (Covert Decl., ¶¶ 11-12); and (c) Favors was discharged because she steadfastly refused to agree to meet performance expectations after returning from her one-day suspension, as required by Alabama Power policy (*id.*, ¶¶ 28, 30-31).

Defendant having come forward with legitimate nondiscriminatory reasons for each of the challenged actions, it is incumbent on Favors to show that these stated reasons are a pretext for religious discrimination. *See Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (once employer articulates reason, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason ... is a pretext for illegal discrimination") (citation omitted). To demonstrate pretext, the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable

---

[22]    *See also Thompson v. Carrier Corp.*, 2009 WL 4980425, *3 (11th Cir. Dec. 23, 2009) (in religious discrimination case, "Thompson did not prove a *prima facie* case of discrimination as she did not produce evidence showing that she was treated less favorably than a similarly-situated individual outside of her protected class"); *Postell v. Green County Hosp. Authority*, 2008 WL 427963, *1 (11th Cir. Feb. 19, 2008) (plaintiff failed to make *prima facie* showing of religious discrimination "as she cannot show that she … suffered any other adverse employment action in contrast with similarly situated employees"); *Richardson*, 2006 WL 1526064, at *4 (denying plaintiff's Title VII claim of religious discrimination based on disparate treatment, where plaintiff failed to present evidence that employees outside protected class were treated more favorably than he) .

factfinder could find them unworthy of credence." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted).[23]

Plaintiff advances no arguments and presents no facts tending to cast doubt on Alabama Power's stated justification for denying her part-time work. With regard to her discipline and termination, Favors' only argument is that there were no rules requiring Customer Service Representatives to attend the Leadership Focus meeting, such that the facts "transparently show false claims of insubordination regarding an optional attendance at a Leadership Focus Group." (Doc. 37, at 7.)

Construing plaintiff's filings generously, she is apparently contending that the company's stated reasons for her discipline and discharge were pretextual because her attendance at the Leadership Focus meeting was optional. Even accepting plaintiff's version of the facts as correct, however, at best this evidence would show that she misunderstood what Covert was telling her. Again, Favors' evidence is that the Leadership Group meeting "was discussed as an optional event as [Covert] stated on April 15, 2008, anyone in the Prichard Business Office could attend." (Favors Decl., ¶ 21.) In other words, Favors' version of the facts is that she interpreted Covert's statement that "anyone could attend" as meaning that her attendance was optional. But Covert's recollection was quite clear that he directed her to attend as a job requirement. Moreover, it is undisputed that Favors acknowledged at the June 28 discussion with Covert that he had used the word "assignment" (Covert Decl., ¶ 17), and Favors wrote in her notes that "Sam ignored me stating I should be present tomorrow. … (Loretta repeated called me into her office trying force me to attend the meeting)." (Complaint, Exh. B, at 3.) Favors' own writings demonstrate that she understood that she was supposed to be present at the meeting, yet she did not go for the sole reason that she did not want to attend. She cannot create a genuine issue of material fact now by contradicting herself. Even if Favors misunderstood Covert's directive to go to the meeting, on this record it cannot be questioned that Covert reasonably believed Favors

---

[23]     *See also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

to have been guilty of insubordination.  *See generally Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470-71 (11th Cir. 1991) (no pretext where plaintiff did not present evidence that employer's stated belief in allegations of misconduct was unworthy of credence, even if the allegations themselves were untrue).

Also, recall that Favors was discharged not for missing a meeting, but for repeatedly refusing to affirm that she was committed to meeting performance expectations, as she was required to do under Alabama Power's written disciplinary policy.  Plaintiff has offered no argument, evidence or reasoning for rejecting this stated reason as pretextual, nor has she otherwise attempted to justify or explain her behavior of April 30 and May 1, 2008.  With full knowledge that she could be fired for not responding, Favors refused to answer Covert's simple question as to whether she would commit to meeting performance expectations, as required under a company policy of which she possessed actual knowledge.

For all of the foregoing reasons, defendant's Motion for Summary Judgment is **granted** as to plaintiff's disparate treatment claims.  She has failed to establish a *prima facie* case of discrimination, or to demonstrate that Alabama Power's stated non-discriminatory reasons for the challenged actions were pretextual.

### C.      *Retaliation Claims.*

The parties agree that Favors has also asserted a claim against Alabama Power for retaliation under Title VII, alleging that she was disciplined and fired for having complained internally of religious discrimination.

To establish a *prima facie* case of retaliation, Favors must show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment action; and (3) [s]he established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted).  Alabama Power does not challenge Favors' ability to satisfy the first two prongs of the *prima facie* case; however, it insists that there is no evidence of the requisite causal connection.

On the surface, Alabama Power's causation argument appears doomed to failure, given the well-established principle that "close temporal proximity may be sufficient to show that the

protected activity and the adverse action were not wholly unrelated." *McCann*, 526 F.3d at 1376 (internal quotation marks and citations omitted). It is rare to find much closer temporal proximity than is present here. After all, the record shows that Favors complained internally of religious discrimination on April 17, 2008, disclosed further details of alleged religious discrimination on April 26, 2008, received level three discipline on April 28, and was fired on May 1.

But close temporal proximity, by itself, is not enough to satisfy the "causal connection" element of a retaliation cause of action. To the contrary, the law is crystal clear that "[t]o establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).[24] On summary judgment, Alabama Power challenges plaintiff's ability to show that Covert, the decision maker who disciplined and fired Favors, was aware of her protected activity. In response, plaintiff admits that "Covert acted without awareness of Favors being involved in protected activity regarding her internal complaint," and characterizes this fact as "unfortunate." (Doc. 37, at 8.) It is more than that. Indeed, her admission that Covert was unaware of her protected activity is, by itself, fatal to Favors' ability to establish a *prima facie* case of retaliation and defeats this cause of action, as a matter of law.

That said, in deference to Favors' *pro se* status, the Court independently reviews the record and finds evidence that Covert (the undisputed decision maker) was in fact aware of Favors' protected conduct as of May 1, 2008, when he terminated her employment. In particular, Covert admits that Johnson notified him of Favors' complaints concerning distribution of religious literature and reading the Bible on April 25, 2008, nearly a week before the discharge decision was made. (Covert Decl., ¶ 32.)[25] On that basis, the Court finds that Favors

---

[24]     *See also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) ("In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citations omitted); *Morris v. Potter*, 2007 WL 3051744, *2 (11th Cir. Oct. 22, 2007) (affirming grant of summary judgment on Title VII retaliation claim where plaintiff did not establish that supervisors had knowledge of her protected expression).

[25]     This fact provides the requisite causal connection only with respect to the discharge action taken on May 1, not the level three discipline action taken on April 28. Although Covert was aware of Favors' protected activity when the discipline was imposed, the (Continued)

can satisfy the causal connection element of her *prima facie* case of retaliatory discharge because the record reflects that the decision maker was aware that Favors had recently made internal complaints of religious discrimination as of the time he decided to terminate her employment.

As discussed *supra*, Alabama Power has unquestionably met its modest burden of articulating a legitimate non-retaliatory reason for Favors' discharge, to-wit:  Her repeated refusal to agree to meet performance expectations when asked over a period of days to do so. Plaintiff has failed to come forward with any evidence of pretext.  Plaintiff's evidence does not reveal any weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered reason for discharging her.  To the contrary, the record establishes that Covert asked her a simple question, namely, whether she was willing to meet company performance expectations.  This question was required by Alabama Power policy for employees who had been placed on level three discipline.  All Favors had to do was answer the question affirmatively and she would have been restored to work without incident.  Yet she stubbornly, repeatedly refused to answer.  Favors knew full well that this course of conduct would expose her to termination; indeed, she called Johnson on April 30 and told him that she would probably be fired that day for not answering Covert's question.  (Johnson Decl., ¶ 20 & Exh. 9.).  There is no inference of pretext presented by these facts, viewed in the light most favorable to plaintiff, and Favors has articulated no argument that would support a finding on this record that Alabama Power's stated reason for terminating her employment was a pretext for unlawful retaliation. Accordingly, Alabama Power is entitled to entry of summary judgment in its favor on the Title VII retaliation cause of action for lack of proof of pretext.

IV.     **Conclusion.**

For all of the foregoing reasons it is **ordered** as follows:

1.      Defendant's Motion to Remove from the Public Record and Place Under Seal (doc. 44) is **denied**, and its Motion for Leave to File Under Seal its Motion to Strike Portions of Declaration (also at doc. 44) is likewise **denied**.  Documents 37

---

uncontroverted record evidence is that he had actually made the decision to discipline Favors back on April 17, at which time he had no knowledge that she had ever complained of religious discrimination.  (Covert Decl., ¶ 32.)

and 38 will not be sealed, and the Clerk of Court is directed to **unseal** document 44 and its exhibit;

2.      Defendant's Motion for Summary Judgment (doc. 28) is **granted**, and this action is **dismissed with prejudice**;

3.      Defendant's Motion to Strike (doc. 44-1) is **moot**; and

4.      A separate judgment will enter.

DONE and ORDERED this 9th day of July, 2010.


s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE